At the outset, Judge Newsom and I are delighted to welcome and introduce to you our visiting judge who is sitting with us this week and helping with our work. Judge Moore brings a world of experience and distinction, having sat with great honor in the District Court for the Southern District of Georgia for many years. He was appointed by President Clinton in 1994, and he indeed had served as the chief judge of that court as well for many years, so we're delighted, Judge Moore, to welcome you and thank you for your efforts in helping us. The second observation, for those of you who may be new to our court, when you make your arguments, you may safely assume that we have had a chance to read the briefs, the record excerpts, and in some instances, we've been able to read the record as well, so feel free as you make your argument to go really right to the heart of the argument. Third and last, again, for those of you not familiar with our lighting and timing system, you'll note that there's a clock that will let you know how much time you have left, and there's a lighting system. Green means, of course, you can go. Yellow is a two-minute warning, and red means your time is up, and we'd be much appreciative if you could bring your remarks to a conclusion when the red light goes on. With that, we welcome all of you to our court, and we will begin with the first case, which is the United States v. Edward Townsend. Good morning. May it please the Court. My name is Paul Kish. I'm counsel for the issues today concerning the sufficiency of the evidence both on a conspiracy charge and for substantive counts. We have an evidentiary question concerning the business records exception to the hearsay rule, and finally, we have some issues surrounding the sentence imposed by the district court. The sufficiency of the evidence questions revolve for the most part about this question of knowledge, and I think it's a very pertinent case in our modern time where there's much electronic currency and transactions that the evidence in this case shows that the victims were fleeced out of money. The money that they transmitted to other people was in the form of 14 digits on the back of these things called a money pack or a green dot, and the question the court has to determine is whether there was sufficient evidence from which a rational jury could have found that the recipient of some of those digits knew how the money was obtained. That's the bottom line, because this was not a case where there was any evidence whatsoever connecting the victims to anybody in any prison. Everyone kept saying it was done that way, but there was no IP addresses, no telephone records, nothing whatsoever connecting these victims and what happened to them and anybody in a prison. What we do know is that the money ended up in accounts that was directed by the appellant to the mother of his child, and other digits ended up with some lady named Tangela Parks here in Stone Mountain, Georgia. That's really all we know about what happened to the digits. Now, the question of knowledge in a money laundering conspiracy is always important, but it's important in a case like this because, remember, the government did not ask for a deliberate ignorance jury instruction. The government did not request a standard Pinkerton charge in a conspiracy case in which people are often found guilty based on the reasonable expectations of what their co-conspirators might have done. Instead, the government tried this case and agreed to try to convince the jury that my client had actual knowledge of how the victims were fleeced. And we submit that the cases we cited in our brief, the Tenth Circuit's Rossiparian decision, the Sixth Circuit's McDougald case, as well as this court's Awan decision, all money laundering convictions that were reversed because the government failed to prove that particular defendant's knowledge of the underlying crime tremendously support our situation. Now, my guess would be Brother Counsel here will stand up and say, well, those cases are very different. Those were not prisoners. Those were not prisoners engaging in actual violation of prison rules using cell phones, engaging in financial transactions. But it's not just a violation of prison rules. The argument was made that what they did constituted a crime as well, didn't it? It did. But I think the cases we cited in our reply brief, Styrone, Chiarella, and this court's Mendez decision all say the government doesn't get to change course midstream. They have to try the case. They have to handle the case the way it was tried in the lower court, and that was that it was the scam that was the crime, not using cell phones, not engaging in financial transactions. So I think maybe the closest case is the Sixth Circuit's McDougald decision. But I think the inference that they would have a jury draw and would suggest that they suggest we ought to draw is that the very fact that an inmate is engaging in conduct that constitutes a felony under the laws of the state suggests that if he's doing it, there's got to be some good reason for him doing it, and that bears upon this question of knowledge and intent. That at least is what they're suggesting. And I agree. On the theory that someone wouldn't normally engage in felonious conduct when they're already incarcerated for a different felony without a pretty good reason for doing it, understanding the consequences of their act, and that therefore one should draw the inference that he well knew what he was doing vis-a-vis the scheme. But that inference then would hold true for the other 22,999 inmates who were also caught with a cell phone. That's what distinguishes that theory, it seems to me. The government proved and relied on the fact that the use of cell phones is endemic in the Georgia prison system. So just because one inmate used a cell phone and engaged— I think they would say, you're right, that it isn't an overpowering inference, but it is an inference among others that a jury could have drawn here, and that because we're obliged to look at the evidence in a light most favorable to the jury verdict, we can safely assume they drew that inference even though they didn't have to, and even though it wasn't in and of itself dispositive. I would agree with that analysis, Judge. Okay. Yes. Finally, on the question of sufficiency, the substantive counts are even in some respects more troubling. Here's what happened. Victim gets scammed. He buys five green dots. He sends two of them that end up in my client's accounts about an hour later. The other two sets of digits end up being used in an account that has the name of this man, Caesar Futch's wife. Her name is Tangela Parks. There is no connection whatsoever between my client and this lady who is at a Stone Mountain store in Georgia who's cashing out these numbers. My client has the two sets of digits that go into his account, yet the jury found him guilty of aiding and abetting whoever it was at the Stone Mountain store here in Georgia who was cashing out those digits there. And we submit that there could conclude that my client aided and abetted that person in their crime. Now, the evidentiary issue is, in my opinion, pretty interesting because I try lots of cases, and we're getting to the point where we are stretching the business record exception to its furthest extent. Tell us about that. It's an interesting issue here. Right. So, remember, the business record rule is something that lets the proponent get around a hearsay objection. It's not an authenticity rule. Basically, the business records exception says there's a certain type of information that can come in if there is a source who can tell us about the information or the circumstances of the information show that it is trustworthy, and the source has to be a qualified person. Now, we are not saying that Company X, if it buys Company Y, can't have a custodian come in and say, yes, we have used this other company's but what we have here is Company X, AT&T. This was the worst one. This guy from AT&T literally flies around the country. He's retired. He says, I am the custodian of records. He knows nothing else. They know nothing about whether the company or entity they purchased the documents from did anything in particular about the material other than just shipping them over as part of a nexus like the other circuits have imposed. I would, yeah, and I don't think that's hard to prove, actually. You come in, you bring in your records custodian and say, yeah, this is the sort that the people in this division rely upon or what these other people in our organization use, but we had none of that here. Now, what do you do, though, with the Lankford case that seems pretty loose, you know, was part of or appeared to be part of the underlying evidentiary, you know, sort of basis? The appeared to be clause in the Lankford opinion seems tough to get around. I'm sorry to interrupt. Tough to get around. That's okay. Here's why Lankford's different. Lankford, it was the business's own records. It wasn't some other business's records. What was challenged in Lankford in the opinion that Judge Marcus wrote was that the defendant there said, well, I don't think that the lady who they brought in as the business record exception could say who prepared the document in that bank. That's not what we have here. Yeah. So in Lankford, you're saying the NBC employee could be charged with knowledge of her own company's record keeping practices, whereas here you're looking back to a predecessor company. Yes, sir. Got it. Now, I can see the government caught me. I failed to make the objection to two of the sets of documents. You're not suggesting, though, are you, that trustworthiness and reliability plays no role in the district court making these determinations, are you? I am not saying that. No, sir. It does play a role. I do agree with that. Okay. The district court thought that there was a certain indicia of trustworthiness and reliability here. Why is that wrong here? Because there's no evidence to support his finding of trustworthiness. I greatly respect Judge Jones, but I think that there was nothing in the record from which he could make that finding, because there's simply, I mean, the one proponent said, I know absolutely nothing about the other company, and the second one said, I assume they did their jobs, and I just submit that that's not a full enough record. Now, as I said, two of the documents, I failed to renew my objection, so we have a plain error standard on those, but the others is the abuse of discretion standard, and then we have to prove prejudice, and especially with the substantive counts, the phone records were the method by which the prosecution attempted to tie what the lady at the Kroger store did with somebody, and they made a big deal about using these phone records showing that there were some phone calls made by the lady whose name was Georgia, and because of that, I would submit that we were prejudiced. Furthermore, the other account now record. Tell me how you sustained substantial prejudice. You agree that two of the items we have to review for plain error, and assuming we say it was error, but it wasn't plain or obvious, you're left with three, at least one, maybe two of which didn't seem to be all that significant. Maybe I misapprehend that. I do believe the court is misapprehending that. Government's Exhibit 11 was an account now record of the lady who's the mother of my client's son. It was through that record that they were able to establish a direct link between the digits lost by one of the victims and her recollection of the phone conversations between the two of them where the money goes into her account and he asks her to basically purchase additional digits. That was substantially prejudicial to our defense because through that document, the government was able to make a direct link to this lady's testimony, and without it, we submit that they would have been unable to do so. Thank you, and you've reserved your full four minutes for rebuttal. Thank you, Judge. You might want to start with the business record issue. Yes, Your Honor, and good morning, and may it please the Court. Starting with the business record issue, and then I'll circle back to the other matters after that. I don't think that there is a question that the individuals that were presented were the people, the two witnesses from AT&T and the witness from Green Dot. These were the witnesses that were presented as the custodians of record for those companies. The records that were admitted at trial came from those companies. It seems to me the difficulty for you as I read the rule is the word show. How is it that these witnesses showed that the original maker of the record had personal knowledge and that the predecessor companies made and kept these in the regular course of business? Well, on the front end, Your Honor, the records custodians testified to all the foundational questions. Yeah, but they were just walks through the elements. I mean, I read the testimony, and it's, you know, did the maker have knowledge? Yes, sir. Was this kept in the ordinary course of business? Yes, sir. Was it made in the course of ordinary business? Yes, sir. I mean, they were just sort of marching through. And I was wondering as I was reading that, how does this person know? I mean, I just want to know, like, show's got to have some teeth to me. And it seems to me that show, I looked it up, and it means something like, you know, convince, you know, by reference to evidence. Other than this person say so, I just don't know what the show is here. Your Honor, I think that there was testimony that was provided during the witness where he walked through how Green Dot both relied on the records that were obtained from financial partners, including AccountNow. He talked about how Green Dot. Tell us where we would find the fact that I understand your argument to be that a successor company may well rely upon the recordkeeping procedures employed by the acquired company. And that may be an indicia of reliability. Where do we find in the record words to that effect suggesting in some way we relied on these guys? After all, we bought their company. We were satisfied with them. And we know that they kept records reasonably well. And we relied upon that in our business. Your Honor, there is not a question directly asking whether when the company was purchased, those records were relied upon. However, there, at least for the Green Dot records, there was evidence presented at trial that Green Dot relied on the financial product information. And that is in Docket Entry 136, pages 79 through 82, where the witness discusses financial partners and how they interface with those financial partners. And then on pages 90 through 93, where they discuss the refund process that could happen if an individual determines that they have been defrauded, they could call into Green Dot in order to potentially freeze or refund their funds if they purchased a MoneyPak and were defrauded. But if the money had moved to another financial partner, then they would not be able to freeze those accounts and freeze that money. So while it's not directly asked as a question, as an evidentiary matter, it is present. The idea that Green Dot relied on other companies' records in order to operate the MoneyPak product— Well, I think I might be recollecting it separately, but 14 and 15, no objection, plain error. 11, 13, 21, 22, 23, yes objections, right? That's correct, Your Honor. Okay, so there are five as to which there was an objection, and there were two others as to   That's correct, Your Honor. That's correct, Your Honor. So let's focus on the five, 11, 13, 21, 22, and 23. So Exhibits 11 and 13 were both records from AccountNow. They were admitted through the Green Dot representative. That Green Dot representative did the boilerplate answers to the foundational questions, but he also testified at times on pages 119 through 128 of his testimony, in the trial testimony, and pages 153 through 154, that's about line 6 to line 12 of his testimony, where he was vordeered and asked additional questions, and he exhibited knowledge about how AccountNow worked. And he stated and identified some of the statements that he made about how AccountNow worked during his questioning, and he answered and he said, these records are created by automated systems and customer service representatives. Is he the one who said, maybe they both said, toward the end of vordeer, at least the piece of it that's excerpted in the briefs, I just assumed that this was done properly, sort of a presumption of business regularity, is that what this sort of boils down to? I think that that answer was done with, was given for Exhibits 21 through 23, Your Honor, and those Exhibits, excuse me, those questions were asked of that records custodian who said he didn't know whether they kept good records, and I believe, I can pull it up on the record right now, Your Honor, if you don't mind. I can confirm that for you. I don't want you to have to waste your argument time looking for it. It's fine. We can find it. But, I mean, would you acknowledge that if the showing that I'm at least concerned about boils down to an assumption or a presumption of business regularity, that that's not really showing? Your Honor, I think that his, those words, the assumption was also covered and informed by his understanding about how a count now worked, and I think that that's present in the record at those record sites that I provided where he described what they did and how those records were created. And the District Court did hear all this testimony. The District Court heard the vordeer, and the District Court did decide that there was reliability and trustworthiness in the testimony and permitted it to be entered. But reliability and trustworthiness, I agree wholeheartedly with Judge Marcus that it has a role to play, but I think the structure of the rule explains the role that it has to play. It comes in at the back end. Reliability and trustworthiness are not a sufficient basis for admission. They are a necessary basis for admission such that you've got to show, show, your witness has to show that the maker had personal knowledge and that these were made and your opponent, to rebut that, if necessary, under subpart E, I think the rule can show that it's not trustworthy or reliable. So I don't think it's enough for the court just to say, eh, sort of the rule says what it says, but I think this is trustworthy and reliable. I agree with that, Your Honor, and I think that there's that testimony from the witness, and I think that the case law of our circuit, including the Lankford case, supports this approach to admitting evidence. In that case, the witness did not have personal knowledge of the contents, and the witness did testify that the answer that the witness gave in that case was that the records were part of or appear to be part of business records kept in the Woodward Court. There's no question we have said repeatedly that the proponent of the document ordinarily need not be the entity whose firsthand knowledge was the basis upon which the facts sought were prepared. The documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness. We've said that repeatedly. Now, what suggested circumstantially or otherwise the trustworthiness? That's what I want you to tell me. You're right. I think that the I heard you just say one thing, maybe two in response to this sort of this dialogue, and I want to know is that all she wrote or is there something else? I heard you just say one item is reliance, that if a successor company relies, that in its own right suggests a certain degree of trustworthiness. If an acquiring company relies on the recordkeeping process or practice of another company, that was one argument you made, right? Or have I misunderstood that? Yes, Your Honor. No, that's correct. Okay. And the second thing you said was, after all, he was asked the questions, you can characterize it as wrote or not, but he was asked unambiguously about whether the records were made and maintained in the ordinary course of business, whether it would have been the ordinary course of business to make and maintain them. And he answered those questions, and at least the district court attached some significance, and we're reviewing for an abuse of discretion. That's the standard here. And so the trial judge gets a whole lot of discretion, even if we might have done it differently or even if we might have probed perhaps with greater intensity than the lawyers or the judge did. But I want to know, is there anything else that supports the theory that there is circumstantial evidence, maybe other testimony, that suggests sufficiently trustworthiness? Your Honor, I think those two principles that you just explained encompass what creates the reliability and trustworthiness for those records. Okay. Let me ask the question slightly differently. Assume, arguendo, we were to say one, quite enough. Is this the stuff of reversible error or is this harmless? Tell me your view on that. Your Honor, the error was certainly a harmless error. Tell me why. You may be right, but I have to confess to you, I don't have the same certainty about it that you do. Defense counsel stated that Government Exhibit 11 and that the phone calls were crucial evidence in the case. And I think the briefing explains why that's not the case, why that is not true. Starting with Government Exhibit Number 11, those Account Now records were records from the girlfriend, Tashondra Williams, whose testimony was very powerful and very inculpatory for the defendant. But those records merely corroborated what she said in her testimony, which was that she had been recruited by the defendant to pick up and purchase new Green Dot money packs to replace the money packs that were obtained from victims. Second, the Government Exhibit Number 11 is actually just the other side of the same coin for Exhibits 14 and 15. So Government Exhibits 14 and 15 were Green Dot records, and those Green Dot records actually matched up with the Account Now records. So they showed the same transaction. So even if you were to take away Exhibit Number 11, there would still be another account record showing that that deposit had occurred and that that transaction had occurred to Tashondra Williams. And on top of that, of course, there was Tashondra Williams' testimony, there was the victim testimony, and Government Exhibits 14 and 15, both of which were the other side of the same coin for Government Exhibits 11 and 13. So I believe that covers the financial records. Now, the telephone records, Your Honor, I don't think that they were helpful. I don't think that they established— We're talking now about 21, 22, and 23? Yes, Your Honor. This is Government Exhibits 21 through 23, and those records showed that Tangela Futch, who is Cesar Futch's wife, who was another individual who had been charged in the case, that she had an AT&T telephone and that there had been phone calls made to Green Dot around the time of the Green Dot transactions for the substantive counts. In addition to that, the telephone records showed that there was another telephone number, starting with 229, that had contacted both her phone number on the AT&T line and the Verizon wire—and had contacted her phone number and contacted Green Dot. And those were Verizon wireless records that the government admitted, and those showed that somebody else had been calling in, although there was no subscriber information. Now, those records, while showing that there were communications, setting aside those records, there was evidence showing that the funds obtained in connection with those four counts went to the defendant and went to Tangela Parks. So Government Exhibits 17, 18, and 12 all showed that after that victim, JG, had been defrauded, that shortly thereafter, within an hour or less, these individuals were then—the money packs were then transferred to Edward Townsend's PayPal account, Edward Townsend's Amex account, Tangela Parks' Green Dot account twice, all within an hour. So those documents are still there, regardless of whether we have those phone calls or not. And in a sense, showing that there was a phone that had a 229 phone number, but no subscriber information—or actually, let me step back. There was also a Green Dot record showing that the 229 phone number and the other phone number had both called in to Green Dot around the time of the transactions as well. And my time is about to expire. That's all right. You take your time to answer this question. It's an important question. Anything else that suggests to you that the era, if there be era, was harmless? There was a substantial amount of other evidence presented in this case, Your Honor, showing that the defendant was guilty beyond a reasonable doubt. We started—I started by mentioning to Chandra Williams' testimony. She explained in detail how she was recruited by the defendant, how she was asked to get new prepaid debit cards by the defendant, how she gave a prepaid debit card to the defendant, how the defendant loaded her prepaid debit card with money packs, and that he instructed her to go to the store and purchase new money packs. That testimony was corroborated by records that were obtained from the various financial companies and the testimony of the victims, TM and WM. There was testimony from Chandra Williams that the defendant stressed that it was important to purchase the new money packs quickly. There was testimony from Chandra Williams that the defendant had used three or four different cell phones to contact her, and that he had contacted her once every two weeks or so to have her purchase money packs for him. And that—and she also testified that her prepaid debit cards had been blocked from the Green Dot Network during the course of the conspiracy. Now, looking at that evidence just from Chandra Williams, a critical fact there is that the defendant was always asking the—to Chandra Williams to take a product, a money pack that had been obtained from a victim, and then simply replace it with another money pack. And that is quintessential money laundering, divorcing the victim's money and the victim's ability to get that money and placing it into another financial product that he controlled, that he could conceal, and that could not be frozen and could not be refunded. So to Chandra Williams' testimony was very important in the case. In addition to her testimony, there are all the bank records and the financial records that we have already previously discussed, and there was the victim testimony that explained how the individuals had been defrauded. And specifically, one individual I'd like to highlight is JG, who testified that when he was called, and this is the victim who was—who in counts two through five had been victimized, and victim JG explained that when he got those phone calls, he talked with three different people, two men and a woman. And that, once again, corroborates the aiding and abetting and conspiracy aspects of the case. And I believe that there's other information listed in the briefing that would play out the rest of the evidence. Thank you very much. Thank you, Your Honor. On the question of reliance, the pages cited by the government all talk simply about what the witness was saying of how the system was structured, the different companies. It never says anything we relied on the other companies, especially that we relied on their records that preceded the time we brought them under our umbrella. Second, the government says on harmlessness that there's no harm. Government's Exhibit 11 was the direct connection between the victim's 14 digits that he sent to somebody over—told someone over the telephone, and my client. Without that, the connection is not there. While there was an awful lot of other circumstantial evidence from which a jury could have drawn an inference, don't you think? I disagree. And that's why we come back to my original argument about what the level—amount of knowledge that was proved. With all due respect, I think this was a close case on knowledge. And the business records tilted and tipped the balance. That's why, if you look at the—I think it's on pages 40 and 41 of our opening brief, I excerpted a large portion of the government's argument. Counsel, while this is a circumstantial case, there's nothing in the record that indicates that Townsend had the ability, and while he was incarcerated, earned this amount of money that showed up in his accounts. That's one thing. The other thing is that there was no reason for these proceeds to be in his account while he was incarcerated. I agree. And if I had a burden of proof, that would be a problem. But I didn't have the burden. It was the government's burden to prove that he knew how the digits were generated. I agree with you. There was no explanation, Judge, as to why the money—at least no explanation presented to the jury on the sentencing question there was. He said, I got the money— But isn't a plausible inference as well? I mean, there's no other rational basis for the transaction, right, to take the money off this money pack card and put it on that money pack card. Like, why would someone do that but for, you know, sort of knowledge of some underlying criminal activity? I don't really understand what the plausible justification for that transaction would be absent some nefarious intent. And that's why I cited the cases, because all of those had these sort of curious circumstances. Why would Mr. McDougall go take money from a known drug dealer, go to a car dealer, say, I'm buying the car in my name, drive the drug dealer back out to California in the car and then leave it? Why would Mr. Rassaparian take all the money from his son's scams, run it through his own bank account, buy stuff for them, and then lie when law enforcement people come to him? Again, very curious. Again, a reversal of a conviction. Why would the banker in this court's Awan decision hang out with people who were laundering gigantic amounts of money and who all told the undercover agents, we will never involve someone who's not on the inside? Again, very curious. Again, a reversal of a money laundering conviction for the failure of the government to prove knowledge. But I think the Court, I think there's one other point, I think those are the points that I wanted to make. Thank you much, counsel. Thank you both. I note, Mr. Kish, that you were court appointed and we very much appreciate you taking on the burden to well and vigorously represent your client. Yes, sir.